IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CAROL WOOTEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| EPWORTH UNITED METHODIST ) | 1:06CV778 |
| CHURCH; the NORTH CAROLINA ) | |
| ANNUAL CONFERENCE, ) | |
| SOUTHEASTERN JURISDICTION, ) | |
| OF THE UNITED METHODIST ) | |
| CHURCH ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION

This matter is currently before the Court on Defendant Epworth United Methodist Church's ("Epworth") Motion for Summary Judgment. [Doc. # 84.] For the reasons stated below, Epworth's Motion for Summary Judgment is GRANTED.

I.

The facts, viewed in the light most favorable to the Plaintiff, Carol Wooten, are as follows. Epworth hired Ms. Wooten in September 2000 as its Director of Music. [Doc. #13, ¶ 6.] As part of her job duties, Ms. Wooten worked with various musicians and was the staff member in charge of monitoring electronic equipment usage. [Doc. # 92, Ex. 1 at 12-14.] Ms. Wooten reported to Rev. Ben Rouse until June 2004 when Rev. Rouse was succeeded by Rev. Gene Cobb. [Doc. # 86 at 16.]

In the spring of 2003, Epworth hired Andrew Oliver, a Duke Divinity School

student, to intern as its Youth Director. [Doc. # 92, Ex. 1 at 17.] Ms. Wooten and Mr. Oliver worked together on an *ad hoc* basis and saw one another at weekly staff meetings. [Doc. # 86 at 22-24.] On December 14, 2003, Mr. Oliver placed a photograph of a male bodybuilder wearing a Speedo bathing suit in Ms. Wooten's music score. Ms. Wooten found the picture during a music service but was able to finish the performance. When Ms. Wooten next saw Mr. Oliver, in January 2004, Mr. Oliver asked Ms. Wooten if she had gotten his surprise. [Doc. # 86 at 24-27.] Ms. Wooten then reported the incident to her supervisor, Rev. Rouse, as required by the Epworth personnel policy. [Doc. # 86, Ex. # 62.] Rev. Rouse remonstrated Mr. Oliver for his behavior. Rev. Rouse then told Ms. Wooten that Mr. Oliver was a young man sowing his wild oats, but that the behavior would get better. [Doc. # 86 at 30-33.]

Soon after the picture incident, Mr. Oliver showed Ms. Wooten a website project he had been working on for the church youth. [Wooten Dep. II at 54-55.] Ms. Wooten told Mr. Oliver that the technology committee would have to approve the project. Mr. Oliver then became very angry and called Ms. Wooten a "stupid bitch." He also told Ms. Wooten, "I can get you fired." Sometime later Mr. Oliver told Ms. Wooten that his father, a district superintendent for the United Methodist Church, made sure a music director who did not cooperate with him was fired. [Doc. # 86 at 54-56, 120-21.]

In March 2004, while preparing for the trip to New York City, Ms. Wooten discovered a coupon for a discount on admission to the "museumofsex," which is

2

located in New York City, in her office mailbox. [Doc. # 86 at 34-35.] Upon Ms. Wooten's return from New York, Mr. Oliver asked her if she had gotten the coupon and if she had used it. Ms. Wooten reported this incident to Rev. Rouse, who said he would speak to Mr. Oliver about his inappropriate behavior. [Doc. # 86 at 43-45; Doc. # 92, Ex. 20.] Later that spring, Ms. Wooten went to Mr. Oliver's apartment to pick up her daughter from a church youth event. Mr. Oliver spoke to Ms. Wooten privately and suggested that her daughter and another church youth member use his bedroom. [Doc. # 86 at 58-59.] Ms. Wooten reported this incident to Rev. Rouse. [Doc. # 86 at 126-27.]

After Rev. Rouse retired, in June 2004, Ms. Wooten again reported the picture incident and the coupon incident to her new supervisor, Rev. Cobb. Rev. Cobb subsequently spoke to Mr. Oliver about this conduct during a supervisory session in which he told Mr. Oliver that his contract with Epworth would not be renewed. [Doc. # 87 at 81-84; Doc. # 86 at 126.]

Additionally, at some point during his employment, Mr. Oliver returned a computer to Ms. Wooten, which had a copy of the movie *Coyote Ugly*, a film rated PG-13, in the DVD drive. Ms. Wooten's husband viewed the film and found it offensive due to its sexual content. [Doc. # 92, Ex. 23 at 3-4.]

Ms. Wooten also alleges a host of other problems with Mr. Oliver, including conflicts over use of one of Epworth's laptop computers, the use of which Ms. Wooten supervised. [Doc. # 86 at 62-67.] Mr. Oliver also failed to file a report

3

concerning use of copyrighted music and gave himself administrative rights to a church computer. [Doc. # 86 at 69-77; Doc. # 92, Ex. 23 at 2.] When confronted by Ms. Wooten about his behavior, Mr. Oliver became very angry. [Doc. # 86 at 54-56; 79-81.] During the time Mr. Oliver was with Epworth, Ms. Wooten felt verbally and physically threatened by him. [Doc. # 86 at 79-80; 85; 98-99.] As a result of her dealings with Mr. Oliver, Ms. Wooten sought psychiatric care and was treated for stress, anxiety and depression. [Doc. # 86 at 136-42.]

Epworth never formally disciplined Mr. Oliver for his behavior towards Ms. Wooten. Mr. Oliver was also not formally disciplined for his failure to file a report on the use of copyrighted music or his use of a church laptop without regard to church technology policy. [Doc. # 87 at 149-50.] However, Mr. Oliver's behavior led Epworth to decide not to renew his employment as Youth Director. Mr. Oliver's contract ended in April 2005, at which time he left Epworth. [Doc. # at 85-86.]

On March 17, 2005, Ms. Wooten met with Rev. Cobb and Don Fleenor, a representative of the Staff-Parish Relations Committee, for her annual performance review. [Doc. # 92, Ex. 5 at 115.] At this meeting, Ms. Wooten described to Mr. Fleenor all of her problems with Mr. Oliver. [Doc. # 92, Ex. 7 at 10-13.] Rev. Cobb became upset that Ms. Wooten reported her problems to a member of the Staff-Parish Relations Committee. [Doc. # 86 at 133-35.] After the performance review, Rev. Cobb became less friendly and more demanding. Ms. Wooten also found herself working significantly longer hours. [Doc. # 86 at 196-97.] Rev. Cobb told Ms. Wooten

4

that if she was perceived as a troublemaker, she would have no future in the Methodist Church. [Doc. # 86 at 135.]

On July 12, 2005, Joan Fletcher, a member of the Epworth congregation, stopped by the church office to make three designated donations. Ms. Fletcher indicated that one check was for the choir, one for the Love Feast and one check was for the purchase of hymnals in her mother's honor. [Doc. # 86 at 143; Ex. # 65.] While at the Epworth office, Ms. Fletcher spoke with Ms. Wooten who suggested that Ms. Fletcher consider designating money to the Creative Arts Special Fund so that hymnals could be purchased in bulk. [Doc. # 86 at 143-45.] The Creative Arts Special Fund was a designated fund under consideration by Epworth as a means of supporting a music and arts ministry headed by Ms. Wooten. At the time Ms. Fletcher wrote her checks, the fund had not been approved and did not exist. [Doc. # 87 at 11.]

After speaking with Ms. Fletcher, Ms. Wooten left the office to return to her work. Ms. Fletcher then gave the checks to the secretary, who placed them in the financial secretary's mailbox. Later that day, Ms. Wooten retrieved the checks from the financial secretary's mailbox and made a copy of all three checks. [Doc. # 86 at 144-48.] Ms. Wooten allegedly called Ms. Fletcher to confirm that buying hymnals from the Creative Arts fund would be acceptable. Ms. Fletcher told her that she did not care which fund the check was placed in so long as hymnals were purchased. Next to the copy of the check designating money "In memory of Mother, Eloise W. Gorski for hymnals," Ms. Wooten wrote "Creative Arts Special Fund." Ms. Wooten

5

also wrote "Cr. Arts Spec. Fund" in the check's memo line. [Doc. # 86 at 150-51; Ex. # 65.] At that time, Epworth had an established fund, called "Curriculum," into which money designated for hymnals was placed. [Doc. # 87 ay 18.]

Rev. Cobb later learned that Ms. Wooten had removed the checks from the financial secretary's mailbox and had made new notations with regards to the check for hymnals. [Doc. # 87 at 9, 18.] Rev. Cobb spoke with Ms. Wooten the next day, July 13, 2005, about her actions. [Doc. # 86 at 153.] That evening, Ms. Wooten left a phone message for Rev. Cobb in which she admitted her actions were wrong and offered to resign. [Doc. # 86, Ex. 66.] The following day, July 14, 2005, Rev. Cobb offered Ms. Wooten the option of either resigning or submitting to an investigation by the Epworth Staff-Parish Relations Committee in accordance with procedures in the Book of Discipline of the United Methodist Church. [Doc. # 87 at 51-53; Doc. # 86, Ex. 68.] In a memo presented to Ms. Wooten, the Chairwoman of the Staff-Parish Relations Committee and the Lay Leader of Epworth, Rev. Cobb cited dishonesty and breach of confidentiality as reasons for disciplining Ms. Wooten. [Doc. # 92, Ex. 11.] Ms. Wooten chose to resign on or about July 15, 2005. [Doc. # 86 at 161.] She filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 30, 2005. [Doc. # 86, Ex. 63.] On August 23, 2006, after receiving a Right to Sue letter, Ms. Wooten filed suit in the Orange County, NC, Superior Court. The case was timely removed to this Court. [Doc. # 2.] Ms. Wooten alleges breaches of Title VII by Epworth, including hostile work environment, disparate

6

treatment in discipline and constructive discharge. [Doc. # 54.]

II.

Summary judgment is proper only when there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those identified by controlling law as essential elements of claims asserted by the parties. In other words, the materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine as to such facts if the evidence is sufficient for a reasonable trier of fact to find in favor of the nonmoving party. Anderson, 477 U.S. at 248. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In evaluating a motion for summary judgment, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. See Fed. R. Civ. P. 56(e). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. Anderson, 477 U.S. at 249. In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. Trial is

7

unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data General Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993).

III.

Title VII of the Civil Rights Act of 1964 ("Title VII") makes it unlawful for an employer to discharge an employee or discriminate in "compensation, terms, conditions, or privileges of employment" because of the employee's sex. 42 U.S.C. § 2000e-2(a)(1). The workplace environment is one of the terms and conditions of employment, and thus, Title VII creates a cause of action for a hostile work environment. EEOC v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 73 (1986)). Ms. Wooten alleges that her work environment was hostile due to her treatment by Mr. Oliver.

Epworth argues that Ms. Wooten's hostile work environment claim is not timely and must be dismissed. Pursuant to 42 U.S.C. § 2000e-5(e)(1), any charge under Title VII must be filed with the EEOC "within 180 days after the alleged unlawful employment practice occurred." A hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2004). That some of the acts contributing to a hostile workplace fall outside the statutory time period does not necessarily affect the timeliness of the filing. So long as at least one act contributing to the hostile work environment occurs within the filing period, all of

8

the acts contributing to the hostile work environment may be considered by a court. Id.

Here, the alleged harassment began on December 14, 2003, and continued until April 2005, at the latest, when Mr. Oliver left Epworth. Ms. Wooten does not claim that anyone other than Mr. Oliver sexually harassed her. [Doc. # 86 at 18.] Ms. Wooten did not file a claim with the EEOC until November 30, 2005, over seven months after the alleged harassment ended. Although Ms. Wooten alleges that Rev. Cobb retaliated against her for reporting Mr. Oliver's behavior to a member of the Staff-Parish Relations Committee, Rev. Cobb's actions are distinct from the actions underlying her claims of sexual harassment. Thus Rev. Cobb's actions will not be considered for purposes of determining the timeliness of the hostile work environment claim. See Nat'l R.R. Passenger Corp., 536 U.S. at 118 (noting that subsequent acts not part of the original hostile work environment claim cannot be used to extend the filing period). Because Ms. Wooten did not file her hostile work environment claim with the EEOC within the 180 day period, her claim is not timely. Therefore, Epworth is entitled to summary judgment as to this claim.

However, even assuming Ms. Wooten's hostile work environment claim was timely filed, summary judgment should still be granted. To prevail on a hostile workplace claim, Ms. Wooten carries the burden of showing that: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender, race or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of

9

employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001). Ms. Wooten has not presented sufficient evidence, as a matter of law, on which a jury could find that the harassment was sufficiently severe or pervasive to alter the conditions of her employment.

Title VII does not protect against all unwanted workplace distractions. Behavior such as "simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Jordan v. Alternative Res. Corp., 458 F.3d 332, 339 (4th Cir. 2006) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)). In order to meet her burden on the third element of a hostile work environment claim, a plaintiff must show that the harassment was "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 192 (4th Cir. 2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-21 (1993)).

As there is no doubt that Ms. Wooten subjectively regarded the environment as abusive, it must be determined whether a reasonable person would also see the environment as hostile or abusive. In making the objective determination as to whether the work environment was abusive, courts consider: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or

10

humiliating, or merely an offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003). Courts must also consider all of the surrounding circumstances, including the social context in which the particular behavior occurs. EEOC v. R&R Ventures, 244 F.3d at 340.

Ms. Wooten has alleged that a wide range of behavior by Mr. Oliver qualifies as actionable under Title VII, but not all of Mr. Oliver's behavior can be characterized as discriminatory harassment. Title VII is not designed to prohibit all verbal or physical harassment in the workplace. Jordan, 458 F.3d at 342 (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Instead, "only harassment that occurs because of the victim's gender is actionable." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772 (4th Cir. 1997). An employee is harassed "because of" her sex if, but-for the employee's sex, she would not have been the victim of the harassment. Id.

Ms. Wooten has only named five instances in which Mr. Oliver's harassment of her could be construed, due to sexual connotation, as happening "because of" her sex: (1) placing the picture of the male body builder in her music; (2) placing the "Museum of Sex" coupon in her mailbox; (3) commenting that her daughter and another church youth member ought to use his bedroom; (4) calling her a "stupid

11

bitch"; and (5) leaving the *Coyote Ugly* DVD in the computer he returned to her.[1] Although Ms. Wooten experienced other conflicts with Mr. Oliver, she has presented no evidence that suggests Mr. Oliver's behavior was directed towards her because of her sex.

These five instances, without more, are not enough for a reasonable person to find that the work environment was hostile or abusive. While Mr. Oliver's actions were inappropriate, they were certainly not frequent, occurring only five times over sixteen months. Moreover, these five instances were neither particularly severe in nature nor physically threatening or humiliating. Mr. Oliver never used sexually explicit language nor propositioned or inappropriately touched Ms. Wooten, and did not engage in behavior that demeaned the status of women in general. Some of these incidents could interfere with a person's work, but the extent of the interference cannot reasonably be considered great. While Mr. Oliver's behavior may have been unsuitable for the workplace, Title VII does not attempt to purge the workplace of vulgarity. Hartsell, 123 F.3d at 773. These isolated incidents engendering mildly offensive feelings are not enough to sustain an action under Title VII.

Even considering these five instances in light of Ms. Wooten's other interactions

---

[1] It is not clear that these five instances were indeed motivated by Ms. Wooten's sex. Harassment between men and women is not automatically discrimination based on sex merely because the words used have sexual content or connotation. Oncale, 523 U.S. at 80. However, since a jury could reach different outcomes as to these five occurrences, they will be considered to be motivated by sex for the purpose of evaluating whether the alleged discrimination against Ms. Wooten was severe or pervasive.

12

with Mr. Oliver, the work environment cannot be seen by a reasonable person as hostile or abusive. Title VII does not ensure a happy workplace, only one that is free from unlawful discrimination. Id. Routine differences of opinion or personality conflicts are not enough to be actionable under Title VII. EEOC v. Sunbelt Rentals, 521 F.3d 306, 315 (4th Cir. 2008). While Ms. Wooten often disagreed with Mr. Oliver over a variety of matters, common workplace conflicts cannot serve to elevate what is otherwise mild harassment to an actionable level.[2] Thus, Ms. Wooten has failed to show that the actions of Mr. Oliver were so severe or pervasive that a reasonable person would find the work environment to be hostile or abusive. Because Ms. Wooten has failed to make a sufficient showing on an essential element on which she bears the burden of proof at trial, summary judgment will be granted as to the hostile work environment claim.

IV.

Epworth also argues that Ms. Wooten has not established a prima facie case for her claim of discriminatory enforcement of disciplinary measures. In order to establish a prima facie case of disparate treatment in discipline, Ms. Wooten must

---

[2] Likewise, that the alleged harassment took place between employees of a church is not enough to create an actionable claim. Title VII is not designed to be a general civility code for the workplace. Jennings v. Univ. of North Carolina, 482 F.3d 686, 696 (4th Cir. 2007) (citing Oncale, 523 U.S. at 82). Ms. Wooten cites no support for her theory that a church is a working environment that must be sheltered from the "cruder aspects of secular life," thereby creating a lower standard for the objective reasonableness inquiry. Ms. Wooten's personal reasons for choosing to work for a church are not relevant to whether an objectively reasonable person would find the work environment to be abusive.

13

establish that (1) she is a member of a protected class; (2) she was qualified for her job and performing satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated her less favorably than other similarly situated individuals outside the protected class. See Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).

Ms. Wooten has failed to produce any evidence to show that she was less favorably treated than another similarly situated individual. Although a plaintiff's situation need not be identical to that of a coworker, a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases" is required. Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). See also Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (holding that comparables must be similarly situated in all relevant respects); Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 221 (5th Cir. 2001) (noting that conduct of a comparator must be nearly identical to plaintiff's conduct).

Ms. Wooten points to Mr. Oliver as a similarly situated individual who received more favorable treatment than she. Mr. Oliver, however, is not a proper comparator for purposes of establishing a prima facie case. First, Mr. Oliver did not hold a similar position to Ms. Wooten. While Ms. Wooten was employed full-time as the Music Director and held supervisory authority over some aspects of church technology, Mr. Oliver was a student hired for a limited period of time in order to receive training for his entry into the ministry and had no supervisory authority.

14

Second, Mr. Oliver's conduct was not similar in any relevant respect to the conduct for which Ms. Wooten was disciplined. Mr. Oliver's misconduct involved: placing a photograph and museumofsex coupon where Ms. Wooten would find them; failing to file a report concerning copyrighted music; removing a laptop from the church without signing it out; and giving himself administrative rights to a church computer. On the other hand, Ms. Wooten's misconduct involved removing a check from the financial secretary's mailbox and attempting to direct the money into a special fund that did not, in fact, exist. Thus, Mr. Oliver's situation is not reasonably close enough to Ms. Wooten's to allow an adequate comparison. Because Ms. Wooten has failed to point to someone similarly situated to her who received more favorable treatment, she cannot establish a prima facie case for disparate treatment in discipline. Therefore, Epworth's Motion for Summary Judgment as to Ms. Wooten's disparate treatment claim will be granted.

V.

Finally, Epworth argues that Ms. Wooten cannot establish a prima facie case for retaliation in the form of constructive discharge.[3] Title VII prohibits an employer from retaliating against an employee because she has made a good faith complaint of

---

[3] To prove a prima facie case of retaliation, Ms. Wooten must show (1) that she engaged in a protected activity; (2) Epworth took an adverse employment action against her; and (3) there is a causal connection between the two. Carter, 33 F.3d at 460. Although constructive discharge is not the only adverse employment action an employer could take, Ms. Wooten has neither plead nor argued another form of retaliation. Therefore, constructive discharge will be considered to be the only adverse employment action taken against Ms. Wooten.

15

Title VII discrimination. 42 U.S.C. § 2000e-3(a); Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999). Where an employee lacks direct evidence of retaliation, she may utilize the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). Under the McDonnell Douglas framework, an employee must first establish a prima facie case of retaliation. Id. The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the employer does so, the employee may still show discrimination by presenting evidence that the articulated reason is merely a pretext for a decision motivated by discrimination. Id.; Williams v. Cerberonics, Inc., 871 F.2d 452 (4th Cir.1989).

Ms. Wooten alleges that Rev. Cobb engaged in a course of conduct designed to force her to resign as retaliation for her reporting Mr. Oliver's alleged Title VII violations to Mr. Fleenor. However, even assuming Ms. Wooten can establish a prima facie case of retaliation, summary judgment is appropriate because Ms. Wooten has failed to forecast any evidence that disputes Epworth's legitimate, non-retaliatory reason for disciplining Ms. Wooten.

The evidence shows that Ms. Wooten, who did not have any authority over church finances, removed a check from the financial secretary's mailbox and placed a notation on and next to Ms. Fletcher's check for hymnals indicating that the money was to be directed to a special fund that did not exist. Rev. Cobb. felt that any inkling of financial misconduct could negatively affect the financial well being of the church,

16

which relied on donations. In his memo to the Chairwoman of the Staff-Parish Relations Committee and the Epworth Lay Leader, Rev. Cobb cites dishonesty and breach of confidentiality as reasons for disciplinary action. The memo, in essence, proposed alternatives: giving Ms. Wooten the option of resigning or having a full and open hearing as outlined by the Methodist Book of Discipline with a possible adverse result ranging from probation to termination ("which I hope will not be the case, but cannot promise to avoid"). Ms. Wooten, in fact, admitted she had done something wrong and offered to resign even before Rev. Cobb presented her with this memo on July 14, 2005. At her meeting with Rev. Cobb on July 14, Ms. Wooten admitted that disciplinary action would be appropriate and chose resignation.

Mishandling of church finances is a legitimate reason for taking adverse action against an employee. Therefore, Epworth has met its burden of articulating a legitimate non-retaliatory reason for its treatment of the check incident.

Ms. Wooten can show that Epworth's reasoning is a mere pretext either by showing that Epworth's explanation is unworthy of credence or through circumstantial evidence sufficiently probative of retaliation. See Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). Unsupported speculation and opinion is not enough to overcome summary judgment. Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). That Ms. Wooten retrieved the checks from the financial secretary's mailbox, copied the checks and added notations is not disputed. Instead Ms. Wooten argues

17

that Rev. Cobb's characterization of the incident as financial misconduct is a pretext for Rev. Cobb's desire to retaliate against her for reporting her interactions with Mr. Oliver to Mr. Fleenor approximately four months beforehand. Ms. Wooten primarily relies on her own opinion, characterizing her handling of the checks as "innocent or, at worst, as trivial." Rev. Cobb, she argues, wrongly ascribed malice to her actions by falsely attempting to make others sound more critical of her than they really were.

Ms. Wooten's assertions that Rev. Cobb acted out of a discriminatory motive are not substantiated by any evidence other than her own opinion. While Ms. Wooten may feel that she did not deserve either of the alternatives presented to her by Epworth, it is not the province of the Court to determine whether an employment decision is wise, fair or correct, only whether it is discriminatory. DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (citations omitted). Because Ms. Wooten cannot point to any evidence that indicates that Epworth used the check incidents as a pretext for a retaliatory action against her, she has not presented sufficient evidence to raise a genuine issue of material fact that may be submitted to a jury. Epworth is therefore entitled to judgment as a matter of law.

VI.

For the foregoing reasons, Defendant's Motion for Summary Judgment will be GRANTED as to all claims.

This the day of December 11, 2008

18

/s/ N. Carlton Tilley, Jr.
                                          United States District Judge